4

*For Publication*

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| THE RARITIES GROUP, INC., | ) | |
| Plaintiff | ) | |
| | ) | CIVIL ACTION |
| v. | ) | NO. 00-10459-REK |
| | ) | |
| RONALD KARP and ALISSA KARP, | ) | |
| d/b/a New York Gold Mart, | ) | |
| Defendants | ) | |
| | ) | |

**Opinion**
May 3, 2000

**KEETON, District Judge.**

**I.**

The court received evidence and heard arguments on April 28, 2000, on Plaintiff's Emergency Motion for Temporary Restraining Order (Docket No. 19) and considered supporting and opposing submissions, including affidavits (Docket Nos. 19, 20, 21, and 22). The court also received evidence and heard arguments on Defendant's Motion to Transfer (Docket No. 3) and considered supporting and opposing submissions (Docket Nos. 7, 8, 10, 11, 12, and 23).

The parties reached agreements at the hearing of April 28 on the basis of which neither party asked this court to act immediately on either of the two motions identified above. The court placed before the parties a draft Order Regulating Nonjury Hearing, proposed for use in the absence of a further agreement resolving other issues left unresolved. The parties were to confer to determine whether they could agree on a hearing date under the Order and a schedule of



the preparatory steps to be taken in advance of the hearing.  The parties having reported inability

to reach full agreement on these matters, the court met with the parties at 10:00 a.m. May 2,

2000, to set a hearing date and schedule.  After consultation, the court set the hearing for May 22,

2000, commencing at  9 a.m., and signed the Order Regulating Hearing, setting the pre-hearing

schedule.

## II.

Plaintiff The Rarities Group, Inc., alleges that its President, Martin B. Paul,

1.      .... engaged in what is known in the rare coin trade
as "split deals" with the Karps over the past five or so years. "Split
deals" are a common industry practice, and coin companies do split
deals simultaneously with multiple entities.  While doing such
deals with the Karps on a coin-by-coin or lot-by-lot basis, Rarities
also routinely did split deals with other entities, and Karp routinely
bought and sold independently of Rarities.  This is a customary
method of doing business; with the industry standard being that
each party is entitled to its share of the profits from each coin or lot
so sold.  (Aff. of Martin Paul, hereafter "MP Aff.", ¶2).

2.      Rarities' split deals with Karp were based on
specific terms.  Rarities evaluated the coins being acquired,
performed curating services on them, and obtained the best
possible grades on the coins to prepare them for market.  The
Karps were responsible for financing the acquisitions, for which
the Karps demanded 12% per annum from Rarities on 50% of the
cost of the coins acquired, from the date of acquisition to the date
of sale (effectively 6% of the total cost).  The parties sometimes
referred to this interest, charged by the Karps to Rarities at the time
a coin was sold, as pre-sale interest.  The Karps were also
responsible for marketing and selling the coins after they were
curated and graded, which involved telephone sales, exposing
inventory to dealers, and attending shows around the country.
Rarities was to receive an equal share of the profits from the sale of
such split coins as the coins were sold.  (MP Aff., ¶3).

3.      In May 1999, as a result of the Karps' refusals to
pay Rarities its existing profits and failure to sell split coins in a

commercially reasonable fashion, Rarities terminated this
relationship with the Karps. (MP Aff., ¶4-11, Exs. 1-2).

4.     On April 3, 2000, the Karps unilaterally ceased any
payments to Rarities despite a current liability to Rarities for past
profits in excess of $1.2 million dollars. (MP Aff., ¶38-40). This
act followed a series of other false assurances and broken promises
from the Karps. (MP Aff., ¶12-28). The Karps began to take all of
the revenues from sales of split coins for themselves, reneging for
the second or third time on an agreement to pay down that existing
liability through an agreed upon formula while liquidating
remaining inventory. *Id.* Since April 3, 2000, Rarities has not
received any money from the sale of split coins while the Karps
have paid all such revenues to themselves in derogation of
Rarities' rights. This latest unilateral and improper act by the
Karps is having a disastrous impact on Rarities, which was not able
even to pay its full tax bill as a result. The Karps are engaged in a
form of commercial extortion in an attempt to force Rarities into
relinquishing rights. (MP Aff., 40).

5.     The Karps also are harming Rarities by failing to
liquidate inventory in a timely and commercially reasonable
fashion, something Rarities has been demanding since 1997 and
one of the reasons Rarities terminated the relationship. Despite the
passage of almost a year since Rarities' May 19, 1999 notice of
termination, the Karps have failed to liquidate remaining
inventory, continuing to hold it an unreasonably long period of
time, while eroding Rarities' share of profits by purporting to
charge 12% interest to Rarities on each coin each year the Karps do
not sell the coin. As of April 3, 2000, there was over $3.5 million
in unsold coins still in inventory, all 1-5 years old and on which the
Karps continue to purport to rack-up interest charges to their
benefit and Rarities' detriment. (MP Aff., ¶31-36, Exs. 5-9).
There is no legitimate business reason for holding split coins for
these lengths of time, and the Karps are enriching themselves at
Rarities' expense.

6.     There simultaneously has been a complete
breakdown of communications, with the Karps refusing to provide
accountings or information to Rarities except through discovery.
(MP Aff., ¶38-40). Rarities believes that this is because the Karps'
pretext for suddenly ceasing any payments to Rarities on April 3,
2000 is not only false, but even on its face never justified ceasing

3

payments to Rarities.  The Karps have maintained that they should be permitted to withhold Rarities' past profits on coins in an amount equivalent to 25% of the cost of unsold inventory together with the interest the Karps are accumulating on those unsold coins. This is contrary to, among other things, the parties' longstanding understanding that pre-sale interest was collectable only on a coin-by-coin basis upon the sale of a coin.  While this was never the agreement between the parties and is just another pretext the Karps have invoked for converting Rarities' monies, even under the Karps' false methodology Rarities was "under-distributed" to use Karp's terminology by well over $135,000 in the beginning of April 2000.  (MP Aff., ¶39).  The Karps are simply doing whatever they want, without any principle or even a pretext which provides a purported justification, and refusing to communicate with Rarities, all with a view toward converting funds owed to Rarities to their benefit.

7.      The Karps' improper and unilateral actions in the beginning of April 2000 followed an express threat in February 2000 by Ron Karp to Paul of Rarities that Karp would make "life very difficult" if his wife remained a defendant to Rarities' claims. (MP Aff., ¶30).  They also followed Rarities' service on April 3 and 4, 2000 of an Amended Complaint, automatic disclosure and discovery in this action.

8.      On April 17, 2000, Rarities' counsel commenced a conference on Rarities' intention to seek appointment of a receiver, attempting to reach agreement on that approach.  (Ex. 4, Apr. 17, 2000 Letter).  On April 18, 2000, the Karps' New York lawyer sent a letter stating that "Mr. Karp ... does not assent to your proposed relief of appointment of a receiver."  In this same letter, the Karps' lawyer also wrote that: Karp does not agree with "characterizations of the amounts owed," *"there simply was never any agreement to make any particular level or sequence of distributions"* and "nor is it correct to characterize any interim formulas used as agreed formulas."  (Ex. 4, Apr. 18, 2000 Haney Letter).  On April 19, 2000, Rarities' counsel sought again to obtain the Karps' agreement to a receiver/escrow arrangement, and spoke directly with Karps' New York counsel.  Obviously, even if there had been *no* agreement, as Karp maintained, that would support a receiver and an escrow.  When the Karps still would not agree, Rarities specifically conferenced whether Karp would agree at least to pay into a mutually agreed upon escrow account or the court all

4

proceeds of sales while Rarities' Motion to Appoint a Receiver was pending. The Karps would not even agree to that.

9.     In fact, the Karps' reaction to this conference was yet another one-sided, self-serving charade – to continue to help themselves to proceeds from sales while purportedly putting payments "to which Mr. Paul believes he is entitled" into a separate account at Chase Bank outside of Rarities' control and in *Karp's* control. In other words, the Karps are taking money for themselves, and simultaneously cutting Rarities off from payments, while maintaining that there is no agreement. On April 20, 2000, the Karps' New York lawyer sent a letter, in essence, that this is what Karp had done (although Karps' lawyer did not mention anything of the sort on the telephone the night before, suggesting that Karp did it on April 20, 2000 to attempt to mitigate his exposure for his unilateral act of ceasing payments on April 3 and to attempt to improve appearances to the Court).

10.     On April 21, 2000, Rarities' lawyer reminded Karp's lawyer that the formula that Karp had reneged on was a generous way of permitting the Karps to pay down an existing liability of $1,283,077, and to pay future profits, while liquidating and that it required payments to be received by Rarities, not deposits by Karp to an account outside Rarities' control. (Ex. 4, April 21, 2000 Poppel letter to Haney). Obviously, there is no benefit to Rarities in acquiescing to payments over time on a $1.2 million present liability only then to have the Karps not make those payments to Rarities. Rarities' lawyer further reminded the Karps' lawyer that this was not the first time that the Karps had reneged or unilaterally ceased payments, and the additional cuteness of putting scheduled payments in an account under *Karp's* control was nothing more than an ineffective way of Karp trying to retain the benefits of a payment schedule while depriving Rarities of the payments. Finally, given the Karps' repeated reneging, Rarities reminded Karp that the amount "to which Mr. Paul believes [Rarities'] is entitled," to use the Karps' phrase, was over $1.2 million dollars as of April 3, 2000 and it was that amount which was and is currently due and owing in its entirety.

11.     A temporary restraining order is necessary to prevent the Karps' from absconding with the coins and/or converting the proceeds of sales for themselves, while depriving Rarities of monies owed it. This relief is supported by the fact that

5

the Karps' currently owe Rarities over $1.2 million in past profits which they are refusing to pay. The relief requested is also supported by the fact that the Karps have provided Rarities with no accounting which even purports to justify their sudden cessation of payments to Rarities on April 3, 2000 (the timing of which suggests a different motivation). Indeed, Karp's lawyer's own inaccurate statement that "there simply was never any agreement to make any particular level or sequence of distributions" supports the relief requested. There is no harm to the Karps as a result of such relief, as the Karps maintain that "there simply was never any agreement to make any particular level or sequence of distributions," and the relief will simply preserve the proceeds pending the briefing and a hearing on Plaintiffs' Motion for Appointment of a Receiver. The Karps certainly can not claim to be harmed to any degree that they are not already intentionally harming Rarities by their own unilateral conduct in taking proceeds for themselves and ceasing any payments to Rarities. Absent such relief, the Karps will convert all or substantially all of the proceeds to their benefit and to Rarities' detriment.

Docket No. 19, pages 1-7 (footnotes omitted).

Plaintiff requests that this court

grant a temporary [order] restraining Ron and Alissa Karp from making sales of coins in which Rarities has an interest or from absconding with, pledging, hypotheticating, or otherwise conveying any interest in such coins, except that the Karps would be permitted to sell such coins for the mutual benefit of Rarities and the Karps only on the condition that they deposit *all* revenues or proceeds (i.e., the full sales price) of such sales (from and including all sales listed on Defendants' April 3, 2000 sales report forward) into a mutually agreed escrow account or to the Court. Rarities also requests a short order of notice on their Motion for Appointment of Receiver.

Id. at 7.

## III.

Defendant Ronald Karp asserts by affidavit,

3.      I am the sole proprietor of New York Gold Mart Co. ("Gold Mart"). My business is to buy and sell rare coins. I have been engaged in this business, through Gold Mart, since January, 1985.

4.      In approximately June, 1994, I entered into a partnership ("Partnership") with The Rarities Group, Inc. ("RGI"), a Massachusetts corporation and plaintiff in this action. I believe Martin Paul is the majority shareholder of RGI, and that his wife, Maria Paul, is the only other shareholder. RGI specializes in the grading and certification of rare coins. Its work enhances the value of Partnership coins that I sell.

5.      The purpose of the Partnership was to buy, restore, inventory and sell rare coins. At inception I contributed approximately $1 million in capital by buying rare coins for the Partnership. RGI did not make any capital contribution at that time. Through Martin Paul, RGI promised to develop equity in the Partnership by contributing a portion of Rarities' share of profits from sales. Martin Paul further promised, on behalf of himself and Maria Paul, personally to guarantee the obligations of RGI to the Partnership.

6.      Under my arrangement with RGI, the partners split resale profits equally, despite my contributing all the initial cash. The partners also split equally certain additional costs other than purchase costs, and developed a mechanism called "presale interest" to compensate me for the fact that I held most of the partnership equity. The Partners also agreed to share equally in the risk of loss. RGI expressly agreed to cover all losses on coins.

7.      Since inception, the Partnership has purchased approximately $22.6 million in coins at cost, and sold over $27 million. See Exh. A, line (b). Gross profits have exceeded $8 million. See Exh. A, line (c). RGI, which made no initial capital investment, has received approximately $2.8 million in distributions, all of which is profit. Over $1 million of such distributions to RGI have been since the decision to dissolve the Partnership.

7

8.     On May 19, 1999, I received a letter from Martin Paul notifying me that RGI wished to dissolve what even then he called "our partnership," and which is annexed hereto as Exhibit C. I agreed, and began to liquidate the Partnership's remaining inventory, which as of June 4, 1999 was approximately $6.6 million, at cost. That liquidation is in process, with approximately $2.9 million in purchase cost of coins having already been sold.

9.     Between June 4, 1999, after the decision to dissolve the Partnership was made, and March 31, 2000, the Partnership has sold and received payment for approximately $3.778 million in coins, with a cost basis of $2.828 million for a gross profit of $950,000. I am continuing to sell coins on behalf of the Partnership. As of March 31, 2000, my average monthly paid sales have been approximately $370,000, with a cost basis of $282,000. In addition, I have pending but unpaid sales of approximately $250,000.

10.     Of the $3.778 million in sales, approximately $1.029 million has been distributed to RGI. After paying joint Partnership liabilities of approximately $1.566 million, I have been left with net distributions of $1.182 million from liquidation sales. This amount is extremely low in relation to Gold Mart's equity percentage in the Partnership assets, which as of March 11, 2000 was approximately 77%. RGI's percentage as of March 11, 2000, therefore, was approximately 23%. Exhibit A is a chart explaining the equity interests of RGI and Gold Mart in the partnership, reflected at line (n). Exhibit A shows the approximately $1.029 million in distributions to RGI since June 4, 1999, represented by the difference between $1,775,095 (distributions as of June 4, 1999) and $2,804,326 (distributions as of March 31, 2000). See Exh. A, line (i).

11.     I made these excessive liquidation distributions to RGI for two reasons: first, as a result of RGI's constant demands for cash, despite my insistence that Partnership liabilities be paid before any large liquidation distributions were made. My second reason was pursuant to an interim distribution formula that I understood would be made part of a liquidation agreement protecting Gold Mart's rights and providing for an orderly disposition of Partnership assets. No liquidation agreement was reached.

8

12.     The crux of the distribution formula is the determination of RGI's equity interest in the Partnership, as set forth more fully in the Amended Complaint I caused to be filed in the United States District Court for the Eastern District of New York, and which is annexed hereto as Exhibit B.  When a coin is old, RGI receives credit for a percentage, equal to its Partnership equity percentage, of the recovered cost of the Partnership's original purchase price of the coin, plus half the profits from its sale.  Therefore, the greater RGI's equity percentage, the greater its credit for each sale.  While negotiating the liquidation, RGI demanded that its equity percentage calculation be artificially increased through deferral of its share of the accrued costs of pre-sale interest on unsold coins.  RGI insisted that pre-sale interest only be charged to it on a per-coin basis, at the time of sale of each coin.  Under RGI's interest deferment scheme, the deferred pre-sale interest would not even be capitalized and added to Gold Mart's capital account.  Rather, Gold Mart would be left with claims against unrealized inventory profits – which are hypothetical and subject to disappearance in a market downturn or in the face of other business risks – while RGI received more of its interest in cash on the front end of the liquidation.

13.     This interim formula was a significant concession by me.  The main disadvantage for me was that it allowed RGI to continue to defer payment of significant amounts of presale interest on older, more difficult to sell coins, even though these costs represent interest incurred, or indeed, paid by me to third-party lenders, as long as six years ago.  As of June 24, 1999, RGI owed one-half of $802,233 ($401,165.50) in presale interest.  That number has continued to grow to one-half of $906,247 ($453,123.50) as of March 11, 2000.  As the liquidation has proceeded, the amount subject to RGI's deferment scheme has grown not only in dollar terms, but from less than 13% of remaining inventory to approximately 23%, as of March 11, 2000.  Its equity percentage has actually decreased, while it continues to enjoy half the upside.

14.     I told Mr. Paul when I agreed to start to use this interim formula that it favored RGI and potentially jeopardized my interests, and that I needed security assurances and concessions from RGI in exchange.  In August, 1999, RGI proposed, but I did not agree to, a proposal that would have required (1) RGI's equity percentage to remain above 25% (to protect Gold Mart), but also

(2) its equity percentage under RGI's interest deferment scheme to remain under 35%. I did not believe this proposal would protect the partners' interests, because it would be unworkable and reliant on unpredictable and uncontrollable variables. No other protective mechanism was, or has been, proposed by RGI. RGI, through Mr. Paul, has now chosen to ignore entirely its assurances that RGI and/or Mr. Paul would take steps to protect my financial interests.

15.    Therefore, in order to protect my rights and for other relief, on October 28, 1999 I caused to be filed an action entitled, Ronald Karp d/b/a New York Gold Mart Co. v. The Rarities Group, Inc., Martin Paul and Maria Paul, in the United States District Court for the Eastern District of New York in October, 1999. The Amended Complaint sets forth the factual details of this dispute in more detail. See Exh. B.

16.    The excessive distributions to RGI have reduced its portion of the Partnership's assets, reducing the ability to bear the costs of a market downturn or other business risks in proportion to its profits interest in the Partnership. Because of the overdistributions to RGI, I have become overexposed to market risks disproportionately to my profits interest in the Partnership.

17.    Since April 6, 2000, I have segregated, and will continue to segregate, a portion of the proceeds from sales of the Partnership assets (to wit, 23.05% of cost, plus 50% of gross profit) in a separate account, called New York Gold Mart Co./RGI Dispute Account.

Affidavit of Ronald Karp, Docket No. 25, pages 2-6 (footnotes omitted).

Defendant objects to plaintiff's request for injunctive relief by stating,

18.    ... RGI's motion seeks to freeze all the proceeds of sale, not just those that Mr. Paul says he is entitled to receive. After ten months of liquidation, the assets of the Partnership are now approximately $3.7 million, at cost. See Exh. A, line (g). My 77% share of the Partnership assets is equal to about $2.85 million, and represents most of my net worth. I have never heard Mr. Paul say or suggest that he is entitled to all ... proceeds of the coins sale.

19.    The granting of a temporary restraining order would have a disastrous effect on my business, effectively shutting it

down to new purchases and preventing me from taking advantage of the resulting selling opportunities. Cash flow is of critical importance in the conduct of my business. As detailed above, the distributions I have made to RGI and the payments for Partnership inventory purchase invoices have greatly strained my cash flow. Since the liquidation began, I have attempted to use the limited cash at my disposal to purchase fresh inventory to leaven the largely stale inventory I am trying to liquidate.

20.     I attend auctions and trade shows regularly to buy and sell coins. Cash is needed on a regular basis to maintain inventory and to take advantage of buying opportunities. Conversely, being known as a source of cash creates buying opportunities. Funds received from the sale of coins are used to purchase coins, usually within a short time span.

21.     I would expect distributions, with respect to my equity in the Partnership, of $200,000 per month over the next 15 months from Partnership coin sales. If I do not receive this cash, I cannot buy new coins. Over the past 5 years my profits have exceeded 20% of purchase costs. Thus, the relief RGI seeks will likely cost me in excess of $40,000 per month in profits, in addition to precluding me from using those monies to make additional profits. It will also damage my relationship with vendors and potentially expose me to legal liabilities because I will not be able to pay my bills. I cannot imagine any legitimate reason for RGI to seek this relief.

22.     A temporary restraining order would also have a severe adverse effect on my reputation in the industry. Our industry is small, functions largely on trust, and reputation is integral to success. I have been a prominent coin dealer for over fifteen years, and have built up a solid reputation among other dealers. The radical remedy of a temporary restraining order would irrevocably mar my business reputation long after the resolution of the instant dispute.

23.     There are several significant auctions and trade shows scheduled for the coming months, which I plan to attend. An order restraining all the sales proceeds of coins would almost completely eliminate my already-limited ability to buy coins.

24.     Other than stopping cash distributions because I

11

believe RGI is overdistributed, I have simply not changed anything about the way I have managed the Partnership assets since June, 1999. I have not taken on any new debt, pledged coins or had any financial reversals that threaten Partnership assets. There is no conceivable basis for attaching my asserts.

25.     I do not plan to do anything with the coins other than continue to sell them for the benefit of the Partnership. Even Mr. Paul agrees that I should continue to do so. There is simply no basis to Mr. Paul's assertion in his affidavit that, without attaching my share of proceeds, his ability to recover in this action will be threatened. In fact, as I understand RGI's claims, RGI's main assertion is that I made coin sales too slowly and allowed excessive pre-sale interest charges to accrue. My equity in the Partnership is far larger than the apparent value of any claim with respect to slow coin sales.

Id. at 6-8.

## IV.

At the conference held on May 2, 2000, the parties and attorneys for the parties and I discussed the form of injunctive order that would issue, should I determine, after considering the submissions and arguments of the parties, that injunctive relief is appropriate. Although the parties did not agree at that conference on the appropriate form of relief, I drafted an order at that conference that will be considered at the hearing on May 22, 2000. The draft reads as follows:

It is Ordered that, with respect to proceeds of any sale made after this date, out of the sale price of each coin sold, defendants must pay forthwith into a special account in the following entity in the District of Massachusetts (namely _____) the following amounts:
(a)     33.2 percent of the cost of the coin, which cost of the coin is defined as the purchase price paid by check by the defendants to acquire the coin, plus
(b)     50 percent of the difference between the sale price of the coin and the cost of the coin, less presale interest (defined as

12

> 12 percent annual interest on 50 percent of the cost of the coin
> from the time of acquisition to the time of sale).

I include the text of the draft in this Opinion to enable the parties to identify with particularity the language of the draft that each believes should be changed, and to allow them sufficient time so that at the hearing on May 22, 2000, they will be prepared to provide legal and factual support for their positions.

## V.

In order to obtain injunctive relief of the kind requested here (either a temporary restraining order or a preliminary injunction), the plaintiff has the burden of satisfying four factors: (1) the likelihood of success on the merits; (2) the potential for irreparable harm if the injunctive relief is not granted; (3) the harm outweighs any hardship that would be inflicted on the defendant or defendants by an injunctive order; and (4) public interest will not be adversely affected by the injunctive order. See Planned Parenthood League of Mass. v. Bellotti, 641 F.2d 1006, 1009 (1st Cir. 1981).

Ordinarily the purpose of preliminary relief is to preserve the status quo so that upon full adjudication on the merits the district court can more effectively remedy any discerned wrongs. See CMM Cable Rep., Inc. v. Ocean Coast Props., Inc., 48 F.3d 618, 620 (1st Cir. 1995). The Court of Appeals for the First Circuit has cautioned that a preliminary injunction that has the effect of disturbing, rather than preserving, the status quo "normally should be granted only in those circumstances when the exigencies of the situation demand such relief." Massachusetts Coalition of Citizens with Disabilities v. Civil Defense Agency, 649 F.2d 71, 76

n.7 (1st Cir. 1981).

   Plaintiff asserts that the circumstances that plaintiff now presents to this court are

"circumstances when the exigencies of the situation demand "mandatory relief that disturbs the

status created by the Karps' upsetting the status existing just before their April actions.  This,

plaintiff asserts, entitles plaintiff to the relief requested in the combination of the Plaintiff's

Emergency Motion for Temporary Restraining Order (Docket No. 19), plaintiff's Motion for

Appointment of a Receiver and request for relief that "will simply preserve the proceeds pending

the briefing and a hearing on Plaintiffs' Motion for Appointment of a Receiver," opposition to

Defendants' Motion to Transfer (Docket No. 3), and contentions that the "Karps certainly can not

claim to be harmed to any degree that they are not already intentionally harming Rarities by their

own unilateral conduct in taking proceeds for themselves and ceasing any payments to Rarities"

and that, absent "such relief, the Karps will convert all or substantially all of the proceeds to their

benefit and to Rarities' detriment."

   These orders requested by plaintiff, if made by the court, would require that

positive action be taken by the defendants.  In these circumstances, to carry its burden plaintiff

must show a legal and factual basis for legal accountability for failure to act.  Ordinarily we

speak of such a determination as a determination of duty to act arising from an ongoing

relationship.

> Many transactions, business and social, involve ongoing
> relationships from which expectations arise that each of various
> possible actors will in some circumstances do something rather
> than entirely failing to act.  Thus, doing nothing may be perceived
> by others as offensive because the relationships among the entire
> group of potential actors create expectations that each actor will
> take into account the ongoing connections not only when acting but

also when thinking about, or being in a position where he or she should think about, doing something rather than nothing.

Judicial decisions about whether the legal system does or should formally recognize this expectation and provide a remedy of some kind for failure to act ordinarily are reasoned as decisions about the issue of duty, with added nuances concerning "duty to act" or "duty of affirmative action."   The paradigm illustration is a dispute over the scope  and applicability of the duty to act affirmatively to aid one in peril.

Robert E. Keeton, Judging in the American Legal System, 498-99, §19.1.5(b) (Lexis Law

Publishing 1999) (footnotes omitted).

The court will need additional factual and legal proffers in order to decide the

issues of "duty" in this case.  How can we, the parties and the court, proceed most expeditiously

to develop adequate proffers?

In the context of a history of ongoing transactions among individuals, or legally recognized entities other than individuals, an often useful way to begin the process of deciding a dispute about the legal consequences of an alleged act or failure to act is to consider whether a contract was in effect at the time and contained provisions that determine how the dispute is to be decided.  In some instances a court approaching a case in this way may reach an outcome for the entire case, as a matter of law, in this first step. That is, the court may conclude that all the parties to the dispute before the court agree that they had a contract in effect among them and the only dispute is about the meaning of its terms.

Especially is this likely if the parties also agree that the entire contract is documentary, and no party wishes to offer extrinsic evidence to show that additional terms were part of the agreement from the outset or that the parties agreed upon later modifications.  In such circumstances as these, ordinarily the meaning of the contract is to be decided by the court as matters of law are decided, and can be decided after briefs and arguments without delaying decision for discovery or hearings that bear upon other issues that will have to be decided if the court concludes that

the contractual provisions are incomplete, or ambiguous, or for
some other reason insufficient to provide a basis for deciding what
the final outcome of the case before the court should be.

Id. at 499, §19.1.6(a) (footnotes omitted).

The defendants claim in this case that a partnership agreement was made orally

and by ongoing practice of the partes in a continuing relationship.  Although defendants claim

that documents relevant to the ongoing relationship and practices associated with it do exist, they

do not contend that those documents (many of which they acknowledge they have not made

available to plaintiff) state all the terms of either the original agreement or of modifications of the

agreement made over the course of the years of the relationship.

In addition to problems arising from these factual uncertainties are problems

arising from the circumstance that this court is not now adequately informed about substantive

law rules and choice of law rules that may be applicable to this case.  What is the extent to which

applicable law will be in doubt or will involve issues of first impression because applicable law

is not fully developed in ways that answer all the questions of law that may have to be answered

to determine outcome of this case.

In some instances, the effort to determine outcome from
provisions of a contract in existence among the parties is frustrated
by uncertainty about what body of law is to be applied to resolution
of the dispute and whether debatable issues exist as to the
applicability to the  case at hand of one or more of the
constitutional, statutory, or judicial mandates, or as to its precise
meaning.  This, too, is a kind of dispute that in some instances can
be decided after briefs and arguments and without delaying
decision for discovery.  This is likely to be so unless the court
concludes that a need exists for hearings that bear upon other
issues that will have to be decided because the contractual
provisions are incomplete, or ambiguous, or for some other reason
insufficient to provide a basis for deciding what the final outcome

16

of the case before the court should be.

Id., at 500, §19.1.6(b) (footnotes omitted).

The submissions now before this court are insufficient to enable the court to decide either the appropriate disposition of the case as a whole, or the precise terms of any preliminary injunction that might be appropriate, or the likelihood of success on the Motion for Appointment of a Receiver, or the final disposition of the motion to transfer this case to another forum.

A central gap in showings of the parties regarding applicable law concerns whether the parties have bound themselves either to terms that plaintiff asserts the court should enforce or to terms that defendants assert the court should enforce. Courts do not make contracts for parties. Parties have great freedom to choose to contract with each other, to choose not to do so, or to choose an intermediate course that binds them in some ways and leaves each free in other ways.

> If neither contract rules nor other rules of law say anything explicitly about the kind of dispute before the court, a third possibility the court must consider is that the alleged act or failure to act is part of a transaction beyond law.

Id. at 500, §19.1.6(c).

## VI.

On the record before me as thus far developed by the parties, a substantial likelihood appears that the agreement between the parties, to the extent effective at this time, is one in which, because of disputes developed and ongoing, the parties have simply failed to bind

each other to terms like those either party is now asking this court to enforce.  Very likely it will

turn out that the ongoing relationship is one of ongoing transactions beyond the terms of their

agreement and beyond law that courts, either in this forum or another, may invoke to fill out

some gap as one or the other of the parties wishes.

Although I invite, explicitly, I do not require the parties to comment on or respond

to the underlying reasoning I have explained in Part V of this Opinion.  What I do require,

however, is that, in their submissions to be filed under the Order Regulating Nonjury Hearing

issued May 2, 2000, the parties be clear and precise in stating their factual, evaluative, and legal

proffers about the terms and conditions of the agreement in effect between them at the beginning

of April, 2000, and any modifications effected by their conduct after March 31, 2000.  Also, the

parties must be clear and precise in stating their contentions about duty to act and legal

responsibility for failure to act after March 31, 2000.

Ordinarily the Motion to Transfer  (Docket No. 3) would be decided before

consideration of any motion for injunctive relief.  Because I determine that questions about the

scope of this court's jurisdiction are intertwined with the central substantive issues involved in

the request for preliminary injunctive relief, I will hear arguments on both motions at the hearing

to be held on May 22, 2000.

_____

United States  District  Judge